# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| FS FOOD GROUP, LLC; | : | |
| PLATE PERFECT CATERING, LLC; | : | |
| MAMA RICOTTA'S KINGSPOINTE, LLC; | : | CIVIL ACTION |
| MIDWOOD SMOKEHOUSE HOLDINGS, LLC; | : | NO.: |
| MIDWOOD SMOKEHOUSE OF BALLANTYNE, LLC; | : | |
| MIDWOOD SMOKEHOUSE OF BIRKDALE, LLC; | : | |
| MIDWOOD SMOKEHOUSE OF CROSS HILL, LLC; | : | |
| MIDWOOD SMOKEHOUSE OF PARK ROAD, LLC; | : | |
| MIDWOOD SMOKEHOUSE, LLC; | : | |
| PTT, LLC; | : | |
| YAFO CENTRAL, LLC; | : | |
| YAFO EAST, LLC; | : | |
| YAFO MORRISON, LLC; AND | : | |
| YAFO RESTAURANT HOLDINGS, LLC | : | |
| PLAINTIFFS, | : | |
| V. | : | |
| | : | |
| THE CINCINNATI INSURANCE COMPANY | : | COMPLAINT |
| DEFENDANT. | : | JURY TRIAL DEMANDED |

Plaintiffs, FS Food Group, LLC, Plate Perfect Catering LLC, Mama Ricotta's Kingspointe, LLC, Midwood Smokehouse Holdings, LLC, Midwood Smokehouse of Ballantyne, LLC, Midwood Smokehouse of Birkdale, LLC, Midwood Smokehouse of Cross Hill, LLC, Midwood Smokehouse of Park Road, LLC, Midwood Smokehouse, LLC, PTT, LLC, Yafo Central, LLC, Yafo East, LLC, Yafo Morrison, LLC, and Yafo Restaurant Holdings, LLC, by way of Complaint, bring this action against Defendant, Cincinnati Insurance Company, and allege as follows:

## NATURE OF THE CASE

1.     Plaintiffs own and operate FS Food Group, LLC, Plate Perfect Catering, LLC, Mama Ricotta's Kingspointe, LLC, Midwood Smokehouse Holdings, LLC, Midwood Smokehouse of Ballantyne, LLC, Midwood Smokehouse of Birkdale, LLC, Midwood Smokehouse of Cross Hill, LLC, Midwood Smokehouse of Park Road, LLC, Midwood

Smokehouse, LLC, PTT, LLC, Yafo Central, LLC, Yafo East, LLC, Yafo Morrison, LLC, and Yafo Restaurant Holdings, LLC, restaurants in North Carolina and one in South Carolina.

2.      To protect the businesses from property damage and the loss of income in the event of a sudden suspension of operations for reasons outside of its control, Plaintiffs purchased commercial multiple peril insurance from Defendant, including specialty property coverage. A copy of the policy is attached as Exhibit 1.

3.      Plaintiffs' insurance policy is an "all-risk" policy that provides coverage for all non-excluded business losses.

4.      The policy expressly includes "Business Income" coverage which promises to pay for loss due to the necessary suspension of operations following loss to property and "Civil Authority" coverage which promises to pay for losses caused by a civil or governmental authority that prohibits access to the covered property.

5.      The policy also provides "Extra Expense" coverage which promises to pay for expenses incurred to minimize losses during the suspension of business operations.

6.      In March, 2020, Plaintiffs were forced to suspend business operations in response to orders by state and local authorities mandating the closure of all non-life sustaining businesses in the States of North Carolina and South Carolina in an effort to protect the public from the global pandemic caused by COVID-19, a highly contagious respiratory virus that has upended daily life and infected more than 6,000,000 people throughout the United States.

7.      Having faithfully paid the policy premiums, Plaintiffs made a claim for business interruption, civil authority and/or extra expense coverage to recoup substantial, ongoing financial losses directly attributed to a series of COVID-19 closure orders.

2

8. By letter dated September 14, 2020, Defendant wrongfully denied Plaintiffs' claim. The letter is attached as Exhibit 2.

9. Through this action, Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. §2201 that the subject policy covers Plaintiffs' financial losses. Plaintiffs further seek damages for breach of contract on the basis that Defendant's denial of coverage runs afoul of the language of the policy and/or the public policy.

## THE PARTIES

10. At all relevant times, FS Food Group, LLC (hereinafter "Plaintiff"), a North Carolina company, maintained a principal place of business at 601 S Kings Drive, Suite HH, Charlotte, North Carolina, 28204.

11. At all relevant times, Plate Perfect Catering, LLC (hereinafter "Plaintiff"), a North Carolina company, maintained a principal place of business at 601 S Kings Drive, Suite AA, Charlotte, North Carolina, 28204.

12. At all relevant times, Mama Ricotta's Kingspointe, LLC (hereinafter "Plaintiff"), a North Carolina company, maintained a principal place of business at 601 S Kings Drive, Suite AA, Charlotte, North Carolina, 28204.

13. At all relevant times, Midwood Smokehouse Holdings, LLC (hereinafter "Plaintiff"), a North Carolina company, maintained a principal place of business at 601 S Kings Drive, Suite HH, Charlotte, North Carolina, 28204.

14. At all relevant times, Midwood Smokehouse of Ballantyne, LLC (hereinafter "Plaintiff"), a North Carolina company, maintained a principal place of business at 601 S Kings Drive, Suite HH, Charlotte, North Carolina, 28204.

15.     At all relevant times, Midwood Smokehouse of Birkdale, LLC (hereinafter "Plaintiff"), a North Carolina company, maintained a principal place of business at 601 S Kings Drive, Suite HH, Charlotte, North Carolina, 28204.

16.     At all relevant times, Midwood Smokehouse of Cross Hill, LLC (hereinafter "Plaintiff"), a North Carolina company, maintained a principal place of business at 601 S Kings Drive, Suite HH, Charlotte, North Carolina, 28204.

17.     At all relevant times, Midwood Smokehouse of Park Road, LLC (hereinafter "Plaintiff"), a North Carolina company, maintained a principal place of business at 601 S Kings Drive, Suite HH, Charlotte, North Carolina, 28204.

18.     At all relevant times, Midwood Smokehouse, LLC (hereinafter "Plaintiff"), a North Carolina company, maintained a principal place of business at 601 S Kings Drive, Suite HH, Charlotte, North Carolina, 28204.

19.     At all relevant times, PTT, LLC (hereinafter "Plaintiff"), a North Carolina company, maintained a principal place of business at 601 S Kings Drive, Suite AA, Charlotte, North Carolina, 28204.

20.     At all relevant times, Yafo Central, LLC (hereinafter "Plaintiff"), a North Carolina company, maintained a principal place of business at 601 S Kings Drive, Suite HH, Charlotte, North Carolina, 28204.

21.     At all relevant times, Yafo East, LLC (hereinafter "Plaintiff"), a North Carolina company, maintained a principal place of business at 601 S Kings Drive, Suite HH, Charlotte, North Carolina, 28204.

4

22.     At all relevant times, Yafo Morrison, LLC (hereinafter "Plaintiff"), a North Carolina company, maintained a principal place of business at 601 S Kings Drive, Suite HH, Charlotte, North Carolina, 28204.

23.     At all relevant times, Yafo Restaurant Holdings, LLC (hereinafter "Plaintiff"), a North Carolina company, maintained a principal place of business at 601 S Kings Drive, Suite HH, Charlotte, North Carolina, 28204.

24.     At all relevant times, Defendant, The Cincinnati Insurance Company (hereinafter "Defendant"), a Ohio corporation, maintained a principal place of business at 6200 S. Gilmore Road, Fairfield, Ohio 45014.

25.     At all relevant times, Defendant regularly conducted business in North Carolina and South Carolina.

## JURISDICTION

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because a complete diversity of citizenship exists between Plaintiffs and Defendant and the amount in controversy is greater than $75,000.

27.     Plaintiffs are citizens of North Carolina.

28.     The Cincinnati Insurance Company is a citizen of Ohio.

29.     This Court has personal jurisdiction over Defendant because at all relevant times Defendant engaged in substantial business activities in and derived substantial revenue from business activities within the State of North Carolina and South Carolina, including soliciting, transacting and conducting insurance business (including the subject policy) and administering claims within the States. Defendant purposely availed itself of the privilege of conducting business in this forum by maintaining continuous and systematic contacts with this forum.

5

30.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial portion of the acts which gave rise to this lawsuit occurred in this District. Venue is also proper pursuant to 28 U.S.C. §1391(b)(3) because Defendant is subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND

### A. PLAINTIFFS' INSURANCE COVERAGE

31.     Defendant entered into a contract of insurance with the Plaintiffs, whereby Plaintiffs agreed to make payments to Defendant in exchange for Defendant's promise to indemnify the Plaintiffs for losses, including, but not limited to, business income losses at the "Described Premises", hereinafter referred to as "Covered Property", owned, managed, and/or controlled by the Plaintiff.

32.     The following 12 locations are "Covered Property" under the policy:

    a.  601 S. Kings Drive, Suite A, Charlotte, North Carolina, 28204

    b.  601 S. Kings Drive, Suite AA, Charlotte, North Carolina, 28204

    c.  601 S. Kings Drive, Suite HH, Charlotte, North Carolina, 28204

    d.  6401 Morrison Boulevard, Suite 8A, Charlotte, North Carolina, 28211

    e.  1401 Central Avenue, Suite 101, Charlotte, North Carolina, 28205

    f.  12410 Johnston Road, Charlotte, North Carolina, 28277

    g.  702 Cross Hill Road, Suite 400 D, Columbia, South Carolina 29205

h. 540 Brandywine Road, Suite C, Charlotte North Carolina 28209

i. 16710 Birkdale Commons Parkway, Suite 103, Huntersville, North Carolina 28078

j. 720 Governor Morrison Street, Suite E-120, Charlotte, North Carolina, 28211

k. 1331 Central Avenue, Suite 101, Charlotte, North Carolina, 28205

l. 1231 East Boulevard, Unit A, Charlotte, North Carolina 28203

(See Ex. 1, Schedule of Locations).

33. The Covered Property is insured under Policy number ECP 054 61 56, issued by Defendant (hereinafter the "Policy"), during the policy period of August 3, 2019, through August 3, 2022.

34. Plaintiffs did not participate in the drafting or negotiation of the words used in the Policy.

35. As the insured, Plaintiffs had no leverage or bargaining power to alter or negotiate the terms of the Policy.

36. The Policy provides (among other things) property, business personal property, business income and extra expense, civil authority order, and additional coverages.

37. Plaintiffs faithfully paid the policy premiums and reasonably expected that the business interruption, extra expense and/or civil authority coverage provided by Defendant would protect against losses in the event of loss of or damage to the property, including in a pandemic, or that state or local officials ordered the closure of its business due to public safety concerns.

38. The Policy is an all-risk policy.

39.     Defendant agreed to "pay for direct 'loss' to Covered Property . . . caused by or resulting from any Covered Cause of Loss." Ex. 1, Section A, p. 3 of 40.

40.     The policy defines Covered Causes of Loss as "direct 'loss' unless the 'loss' is excluded or limited" by the Policy. Ex. 1, Section A3(a), p. 5 of 40.

41.     "Loss" is defined as "accidental loss or accidental physical damage." Ex. 1, Section G.8, p. 38 of 40.

42.     In the Business Income (and Extra Expense) Coverage Form, Defendant agreed to pay for Plaintiffs' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration" caused by direct loss caused by or resulting from any Covered cause of Loss. Ex. 1, Section A.5b., p. 18 of 40.

43.     "Business income" means net income (profit or loss) before tax that Plaintiffs would have earned if no physical loss or damage had occurred as well as continuing normal operating expenses incurred.

44.     In the Business Income (and Extra Expense) Coverage Form, Defendant also agreed to pay necessary Extra Expense that Plaintiffs incurred during the "period of restoration" that the insureds would not have incurred if there had been no direct physical loss or damage to the Covered Property.

45.     "Extra expense" includes expenses to avoid or minimize the suspension of business, continue operations, and to repair or replace property.

46.     In the Business Income (and Extra Expense) Coverage Form, Defendant also agreed to "pay for the actual loss of 'Business Income'" that Plaintiffs sustain "and any Extra Expense . . . caused by action of civil authority that prohibits access to" the Covered Property when a Covered Cause of Loss causes damage to property near the Covered Property, the civil authority prohibits

access to property immediately surrounding the damaged property, and the civil authority action is taken "in response to dangerous physical conditions." Ex. 1, Section 4A.3(b), p. 19 of 40.

47. The Policy does not contain any Virus Exclusion as is often in All-Risk policies.

48. Covid-19 is not a pollutant as defined in Plaintiff's policy.

49. Within the insurance industry, and unknown to Plaintiffs, the word "loss" and the word "damage" have a customary usage more expansive than "loss" and "damage" as used in policy, and "loss" and "damage" includes "contamination".

50. The words "loss" and/or "damage" are used for different purposes within the policy and have more than one potential meaning.

51. "Loss" and/or "damage" are not synonymous.

52. In this policy "damage" is used with the disjunctive "or" when paired with "loss" and therefore must have a different meaning than "loss".

53. The words "loss" and "damage" are ambiguous as used by Defendant.

54. The word "damage" should be interpreted to have its normal and ordinary meaning-physical harm that impairs the value, usefulness or normal function of something.[1]

55. The COVID-19 virus causes direct physical damage, as well as indirect non-physical damage, as that word is commonly used.

56. The word "loss" should be interpreted to have its normal and ordinary meaning.

57. Loss has been defined as follows:

    a. Loss is the fact of no longer having something or having less of it than before.[2]

    b. Loss is the disadvantage you suffer when a valuable and useful thing is taken away.[3]

---

[1] https://www.lexico.com/definition/damage
[2] https://www.collinsdictionary.com/us/dictionary/english/loss
[3] https://www.collinsdictionary.com/us/dictionary/english/loss

      c.   Decrease in amount, magnitude or degree.[4]

      d.   The amount of an insured's financial detriment by death or damage that the insurer is liable for.[5]

58.     Loss, as that word is commonly used, need neither be direct nor physical.

59.     The Business Income, Extra Expense and Civil Authority provisions of the Policy were triggered by damage and loss caused by COVID-19, the related closure orders issued by local, state and federal authorities, and Plaintiff's inability to use and/or restricted use of the Covered Property.

## B. THE COVID-19 PANDEMIC

60.     On March 11, 2020, the World Health Organization officially declared COVID-19 a global pandemic.

61.     COVID-19 is a cause of real physical loss and damage to Covered Property.

62.     COVID-19 is a physical substance.

63.     COVID-19 remains stable and transmittable in aerosols for up to three hours, up to 24 hours on cardboard and up to two to three days on plastic and stainless steel.[6]

64.     The ability of the deadly virus to physically infect and remain on surfaces of objects or materials, i.e. "fomites," for up to twenty-eight (28) days has prompted health officials in countries like the United States, China, Italy, France and Spain to disinfect and fumigate public areas before reopening them.

---

[4] https://www.merriam-webster.com/dictionary/loss
[5] https://www.merriam-webster.com/dictionary/loss
[6] *See e.g.* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last accessed May 23, 2020).

10

65.     To avoid the increased risk of contracting the virus in congregate environments, the

U.S. Centers for Disease Control and Prevention ("CDC") advised against gatherings of more than

10 people.

## C.  THE COVERED CAUSE OF LOSS

### 1.  Physical Loss

66.     Plaintiffs sustained direct physical loss of or physical damage to the Covered

Properties.

67.     The direct physical loss of or physical damage to the Covered Properties was the

result of a Covered Cause of Loss.

68.     Losses due to the COVID-19 pandemic are a Covered Cause of Loss under the

Policy.

69.     The presence of virus or disease can constitute physical damage to property, as the

insurance industry has recognized since at least 2006. When preparing so-called "virus" exclusions

to be placed in some policies, but not others, the insurance industry's drafting arm, Insurance

Services Office, Inc. ("ISO"), circulated a statement to state insurance regulators that stated as

follows:

> Disease-causing agents may render a product impure (change its
> quality or substance), or enable the spread of disease by their
> presence on interior building surfaces or the surfaces of personal
> property. When disease-causing viral or bacterial contamination
> occurs, potential claims involve the cost of replacement of property
> (for example, the milk), cost of decontamination (for example,
> interior building surfaces), and business interruption (time element)
> losses. Although building and personal property could arguably
> become contaminated (often temporarily) by such viruses and
> bacteria, the nature of the property itself would have a bearing on
> whether there is actual property damage.

70.     COVID-19 caused direct physical loss of or damage to the Covered Property under the Policy.

71.     The risk of COVID-19 entering the Covered Property and contaminating the surfaces is direct physical loss of and damage to the Covered Property.

72.     COVID-19 renders the Covered Property unsafe, uninhabitable, or otherwise unfit for its intended use.

73.     Plaintiff's loss of use of the Covered Property constitutes direct physical loss.

74.     Plaintiff's restriction of use of the Covered Property constitutes direct physical loss.

75.     The "COVID-19 Effect" also produces physical loss of and damage to the property.

76.     Social anxiety over public health and society's change in perception that indoor establishments are unsafe due to COVID-19 creates "physical loss and damage" for purposes of commercial property coverage.

77.     The public's and customers' change in perception is the functional equivalent of damage of a material nature or an alteration in physical composition.

78.     Plaintiff's business income loss coverage within the Policy was triggered.

**2.   Civil Authority Orders**

79.     The presence of COVID-19 has prompted civil authorities throughout the country to issue orders mandating the suspension of non-essential businesses across a wide range of industries, including civil authorities with jurisdiction over Plaintiff's business.

80.     On March 10, 2020, North Carolina Governor Roy Cooper issued Executive Order No. 116, declaring a State of Emergency in North Carolina as a result of COVID-19. Order 116 is incorporated herein and attached as Exhibit 3.

81.     On March 17, 2020, Governor Cooper issued Executive Order No. 118, declaring "an imminent hazard exists and that entities….must limit the sale of food and beverage to carry-out, drive-through, and delivery only in order to abate the hazard…". Order 118 is incorporated herein and attached as Exhibit 4.

82.     On March 27, 2020, Governor Cooper issued Executive Order No. 121, declaring that "All individuals currently in the State of North Carolina are ordered to stay at home…". Order 121 further commanded: "non-essential business and operations must cease. All businesses and operations in the State, except COVID-19 Essential Businesses and Operations…are required to cease all activities within the State…." Order 121 is incorporated herein and attached as Exhibit 5 (emphasis added).

83.     On April 23, 2020, Governor Cooper issued Executive Order No. 135 which extended the duration of Executive Order No. 121. Order 135 is incorporated herein and attached as Exhibit 6.

84.     On May 20, 2020, Governor Cooper issued Executive Order No. 141 which eased restrictions of Executive Order No. 121, while continuing to restrict access to retail properties. The number of customers allowed in a property was limited to "Emergency Maximum Occupancy". The Emergency Maximum Occupancy for a Retail Business "is the lowest number produced by applying the following two tests:

    a.  Limit the number of customers in the store to fifty percent (50%) of stated fire capacity (or, for spaces without a stated fire capacity, no more than twelve (12) customers for every one thousand (1000) square feet of the location's total square footage, including the parts of the location that are not accessible to customers or guests).

    b.  Limit the number of people in the store so that everyone can stay six (6) feet apart.  Order 141 is incorporated herein and attached as Exhibit 7.

13

85.     On June 24, 2020, Governor Cooper issued Executive Order No. 147 which extended the duration of Executive Order No. 141. Order 147 is incorporated herein and attached as Exhibit 8.

86.     On July 16, 2020, Governor Cooper issued Executive Order No. 151 which again extended the duration of Executive Order No. 141. Order 151 is incorporated herein and attached as Exhibit 9.

87.     On July 28, 2020, Governor Cooper issued Executive Order No. 153 which prohibited restaurants from selling or serving alcoholic beverages for onsite consumption between 11:00PM and 7:00AM. Order 153 is incorporated herein and attached as Exhibit 10.

88.     On August 31, 2020, Governor Cooper issued Executive Order No. 162 which extended the duration of Executive Order No. 153 to at least October 2, 2020. Order 162 is incorporated herein and attached as Exhibit 11.

89.     On September 4, 2020, Governor Cooper issued Executive Order No. 163 which restricted the number of guests permitted in restaurants. Order 163 is incorporated herein and attached as Exhibit 12.

90.     On September 30, 2020, Governor Cooper issued Executive Order No. 169 which continued the restrictions to limit the number of customers in bars and restaurants and to prohibit the late-night service of alcohol. Order 169 is incorporated herein and attached as Exhibit 13.

91.     Similar orders were issued by South Carolina Governor Henry McMaster.

92.     On March 13, 2020, Governor McMaster issued Executive Order No. 2020-8, declaring a State of Emergency in South Carolina as a result of COVID-19. Order 2020-8 is incorporated herein and attached as Exhibit 14.

93.     On April 3, 2020, Governor McMaster issued Executive Order No. 2020-18, closing non-essential businesses, including retail stores. Order 2020-18 is incorporated herein and attached as Exhibit 15.

94.     These Orders, as they related to the closure of all "non-essential businesses", evidence awareness on the part of both state and local governments that COVID-19 causes damage vis-à-vis contamination to property. This is particularly true in places such as Plaintiffs' business where the contact and interaction cause a heightened risk of the property becoming contaminated by COVID-19.

95.     Plaintiffs' business income loss was triggered with each restrictive civil authority action and order which prohibited access to the Covered Property.

96.     COVID-19 caused direct physical loss of or damage to property in the area immediately surrounding and within 1 mile of the Covered Premises.

97.     COVID-19 rendered property within 1 mile of the Covered Property unsafe, uninhabitable, damaged, and/or otherwise unfit for its intended use.

98.     The Civil Authority Orders were implemented to prevent the spread of COVID-19 by prohibiting and/or limiting people from entering the Covered Property because of (a) actual and immediate risk of loss of and damage to the Property and other property in the immediate vicinity, (b) characteristics of the Covered Property, and (c) the high probability that further contamination and damage would occur if access to the Property was not limited.

99.     Further, Plaintiffs' Covered Property suffered "direct physical loss or damage" due to the Civil Authority Orders mandating that Plaintiffs discontinue its primary use of the Covered Property. Each restrictive Order, in and of itself, constitutes a Covered Cause of Loss within the meaning of the Policy.

15

**D. IMPACT ON PLAINTIFF**

100.   In March 2020, as a direct result of the COVID-19 pandemic and closure Orders referenced herein, Plaintiffs were forced to close the doors of their businesses.

101.   Because people—employees, customers and others— frequent all areas of Plaintiffs' properties, there is an ever-present risk that the Covered Property is contaminated and would continue to be contaminated if the business remained open to the public.

102.   Because business is conducted in an enclosed building, the Covered Property is more susceptible to being or becoming contaminated, as respiratory droplets are more likely to remain in the air or infect surfaces within the Covered Property for far longer or with significantly increased frequency as compared to facilities with open-air ventilation.

103.   Plaintiffs' business is highly susceptible to contamination and damage.

104.   Plaintiffs' business is also highly susceptible to rapid person-to-property transmission of the virus, and vice-versa, because the activities of the employees and customers interact in close proximity to the property and to one another.

105.   COVID-19 physically impacted the Covered Property. Any effort by the Defendant to deny the reality that the virus has caused physical loss and damage would constitute a false and potentially fraudulent misrepresentation that could endanger the Plaintiff and the public.

106.   As a direct result of the COVID-19 pandemic and the Closure Orders, Plaintiffs' incurred, and continue to incur, among other things, a substantial loss of business income and additional expenses covered under the Policy.

107.   The covered losses incurred by Plaintiffs and owed under the Policy increase daily.

108.   Plaintiffs submitted a claim to Defendant under the Policy for Plaintiff's losses.

109.   Defendant wrongfully denied Plaintiffs' claim.

16

110.    A declaratory judgment that the Policy provides coverage will ensure that Plaintiffs' reasonable expectations of coverage are met and prevent Plaintiffs from being left without vital coverage acquired to ensure the survival of the business.

111.    A declaratory judgment that the Policy provides coverage will also further the public policy of the State.

## CAUSES OF ACTION

### COUNT I
#### DECLARATORY RELIEF

112.    Plaintiffs incorporates by reference the preceding paragraphs as if fully set forth herein.

113.    The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

114.    Declaratory relief is intended to minimize "the danger of avoidable loss and unnecessary accrual of damages." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2751 (3d ed. 1998).

115.    Plaintiffs request a Declaratory Judgment to affirm that the Policy provides business income coverage because of losses attributable to civil authority actions, and because the denial violates public policy.

116.    Plaintiffs' interest in the Policy and the declaratory relief sought is direct, substantial, quantifiable, and immediate.

117.    An actual controversy has arisen between Plaintiffs and Defendant as to the rights, duties, responsibilities and obligations of the parties under the Policy to reimburse Plaintiffs for

17

their business income loss. Plaintiffs contend and, upon information and belief, Defendant disputes and denies that:

    a. Plaintiffs sustained direct physical loss of or damage to the Covered Property under the Policy;

    b. The Plaintiffs are entitled to coverage for business income loss and extra expense;

    c. The Policy provides business income coverage in the event that COVID-19 directly or indirectly caused a loss and/or damage at the Covered Property or immediate area of the Covered Property;

    d. The closure Orders described herein constitute a prohibition of access to the Covered Property;

    e. The prohibition of access by the closure Orders described herein has specifically prohibited access as defined in the Policy;

    f. The closure Orders described herein trigger coverage; and

    g. The Policy provides coverage to Plaintiffs for any current and future closures due to physical loss or damage directly or indirectly resulting from COVID-19 under the Civil Authority Coverage.

118. Resolution of the duties, responsibilities and obligations of the Parties is necessary as no adequate remedy at law exists and a judicial declaration is required to resolve the dispute and controversy.

## COUNT II
### BREACH OF CONTRACT - COMPENSATORY RELIEF

119. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

120. At all times relevant hereto, Plaintiffs were insured under the Policy with Defendant.

18

121. Plaintiffs purchased, elected and paid premiums to Defendant for the property, business income and extra expense, civil authority and additional coverages applicable to the losses claimed in this action.

122. All the information regarding the insured's business and risks thereof was known to Defendant when the Policy was issued.

123. Plaintiffs are entitled to recover all losses caused by COVID-19 and/or civil authority orders.

124. Defendant was advised of Plaintiffs' claims and demand for coverage under the Policy.

125. Plaintiffs complied with all requirements of the Policy.

126. Defendant is duty bound and obligated to act in good faith towards the insured under the Policy to make fair and reasonable efforts and offers to resolve Plaintiffs' claim.

127. Defendant breached the terms and provisions of the Policy by denying the claims of Plaintiffs for all losses caused by COVID-19 and the civil authority orders.

128. The breach of the indemnification obligations under the Policy by Defendant has caused Plaintiffs to suffer loss and harm.

129. Defendant is required to pay Plaintiffs all covered losses caused by COVID-19 and civil authority orders including business income, extra expense, contamination civil authority and other coverages under the Policy.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter judgment against the Defendant and declare, as a matter of law, the following:

      a. The civil authority orders prohibit access to Plaintiffs' Covered Property;

b.  The civil authority orders "prohibit access" as defined in the Policy;

c.  The civil authority coverage applies to Plaintiffs due to physical loss or damage at the Covered Property or other premises in the immediate area of the Covered Property;

d.  Plaintiffs are entitled to coverage for business income loss;

e.  Plaintiffs sustained direct physical loss of or damage to the Covered Property under the Policy;

f.  The inability to use the Covered Property amounts to a physical loss or damage as defined in the Policy;

g.  Defendant's denial of coverage for losses caused by the referenced civil authority orders violates public policy; and

h.  Defendant's denial of coverage for losses caused by the referenced civil authority orders amounts to a breach of contract.

Plaintiffs further seeks an Order requiring Defendant to pay Plaintiffs all covered losses caused by loss of access to the Insured Premises, including business income, extra expense, contamination, civil authority and other coverages under the Policy; and such other relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

**DEMAYO LAW OFFICES LLP**

**ANAPOL WEISS**

By: _[signature]_

By: _[signature]_

Michael A. DeMayo, Esquire
Adrienne S. Blocker, Esquire
DeMayo Law Offices, LLP
Post Office Box 34426
Charlotte, NC 28234
michael@demayolaw.com
ablocker@demayolaw.com

Counsel for Plaintiffs

Dated: October 26, 2020

Sol H. Weiss, Esquire
James R. Ronca, Esquire
Gregory S. Spizer, Esquire
Ryan D. Hurd, Esquire
Paola Pearson, Esquire
One Logan Square
130 N. 18th Street, Suite 1600
Philadelphia, PA 19103
sweiss@anapolweiss.com
jronca@anapolweiss.com
gspizer@anapolweiss.com
rhurd@anapolweiss.com
ppearson@anapolweiss.com

Counsel for Plaintiffs

(Motions for *Pro Hac Vice* Admission
to be filed).

21