**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:20-CV-00588-RJC-DSC**

| | | |
|---|---|---|
| **FS FOOD GROUP LLC** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **MEMORANDUM** |
| **v.** | ) | **AND** |
| | ) | **RECOMMENDATION** |
| **THE CINCINNATI INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

THIS MATTER is before the Court on "Defendant The Cincinnati Insurance Company's Rule 12(b)(6) Motion to Dismiss Plaintiffs' Amended Complaint," Doc. 15, and the parties' briefs and exhibits.

The Motion has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and is now ripe for the Court's consideration.

Having fully considered the arguments, the record, and the applicable authority, the undersigned respectfully recommends that Defendant's Motion be <u>granted</u> as discussed below.

## I. PROCEDURAL AND FACTUAL BACKGROUND

Accepting the factual allegations of the Amended Complaint, Doc. 12, as true, Plaintiffs[1] own and operate restaurants and catering companies in North and South Carolina. Doc. 12 at 1-2. Plaintiffs entered into an insurance contract with The Cincinnati Insurance Company

---

[1] Plaintiffs include FS Food Group, LLC, Plate Perfect Catering LLC, Mama Ricotta's Kingspointe, LLC, Midwood Smokehouse Holdings, LLC, Midwood Smokehouse of Ballantyne, LLC, Midwood Smokehouse of Birkdale, LLC, Midwood Smokehouse of Cross Hill, LLC, Midwood Smokehouse of Park Road, LLC, Midwood Smokehouse, LLC, PTT, LLC, Yafo Central, LLC, Yafo East, LLC, Yafo Morrison, LLC, and Yafo Restaurant Holdings, LLC. Doc. 12 at 1.

("Cincinnati") on August 3, 2019, policy number ECP 054 61 56 ("Policy"), with a policy period effective August 3, 2019 to August 3, 2022. Doc. 12 at 6; Doc. 1-2 at 3. The Policy provides that Defendant will indemnify Plaintiffs for covered losses, "including, but not limited to, business income losses at the Covered Properties, which are owned, managed, and/or controlled by Plaintiff." Doc. 12 at 6. Covered properties are defined by the Policy to include Plaintiffs' business locations. Doc. 1-1 at 25; Doc. 12 at 3-5.

The Policy is an "all risk" policy, which "provides coverage for all non-excluded business losses." Doc. 12 at 2. Section A of the Policy provides that Defendant "will pay for direct 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss." Doc. 1-1 at 25. The Policy defines "loss" as "accidental physical loss or accidental physical damage." Doc. 1-1 at 60. The Policy defines "premises" as "the Locations and Buildings described in the Declarations." Id. at 61. The Policy does not define "damage" or include a virus exclusion provision. Doc. 12 at 8.

On March 10, 2020, Governor Roy Cooper declared a state of emergency in response to the COVID-19 pandemic. Doc. 1-3. On March 17, 2020, the Governor issued Executive Order No. 118 limiting the "sale of food and beverages to carry-out, drive-through, and delivery only[.]" Doc. 1-4 at 4. On March 27, 2020, Governor Cooper issued a "Stay at Home" Order, which permitted restaurants to serve food "for consumption off-premises." Doc. 1-5 at 10. All indoor dining services were suspended until May 20, 2020, when North Carolina commenced Phase 2 of its reopening plan. Doc. 1-7 at 8. Under Phase 2, restaurants could operate indoor dining at fifty percent occupancy. Id.

South Carolina Governor Henry McMaster issued similar executive orders. Doc. 12 at 2. In response to the executive orders issued by Governors Cooper and McMaster, Plaintiffs

suspended or reduced their business operations. Doc. 12 at 2. On June 10, 2020, FS Food Group

submitted claims for its ten locations and its catering company. Doc. 1-2 at 2. The claims were

for "business interruption, civil authority and/or extra expense coverage to recoup substantial,

ongoing financial losses directly attributed to a series of COVID-19 closure orders." Doc. 12 at

2.

The Policy's Coverage Extensions section includes provisions for Business Income,

Extra Expense, and Civil Authority, as follows:

**(1) Business Income**

We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due
to the necessary "suspension" of your "operations" during the "period of restoration."[2]
The "suspension" must be caused by direct "loss" to the property at a "premises" caused
by or resulting from any Covered Cause of Loss.

With respect to the requirements of the preceding paragraph, if you are a tenant and occupy
only part of the site at which the "premises" are located, for the purpose of this Coverage
Extension only, your "premises" is the portion of the building that you rent, lease or
occupy, including:
> (a) Any area within the building or on the site at which the "premises"
> are located if that area services or is used to gain access to the "premises"; and
> (b) Your personal property in the open (or in a vehicle or portable storage unit)
> within 1,000 feet of the building or 1,000 feet of the "premises", whichever is
> greater.

**(2) Extra Expense**

(a) We will pay Extra Expense you sustain during the "period of restoration." Extra expense
means necessary expenses you sustain (as described in Paragraphs (2)(b), (c) and (d) during
the "period of restoration" that you would not have sustained if there no direct "loss" to
property caused by or resulting from a Covered Cause of Loss.

(b) If these expenses reduce the otherwise payable "Business Income" "loss", we will pay
expenses (other than the expense to repair or replace property as described in Paragraph
(2)(c)) to:

---

[2] Under the Policy, "Period of Restoration" means the period of time that either (a) begins at the time of direct "loss"
or (b) ends on the earlier of: (1) The date when the property at the "premises" should be repaired, rebuilt, or replaced
with reasonable speed and similar quality; or (2) The date when business is resumed at a new permanent location.
Doc. 1-1 at 60-61.

1) Avoid or minimize the "suspension" of business and to continue "operations" either:

    a) At the "premises"; or

    b) At replacement "premises" or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location; or

2) Minimize the "suspension" of business if you cannot continue "operations".

(c) We will also pay expenses to:

    1) Repair or replace property; or

    2) Research, replace or restore the lost information on damaged "valuable papers and records";

but only to the extent this payment reduces the otherwise payable "Business Income" "loss". If any property obtained for temporary use during the "period of restoration" remains after the resumption of normal "operations", the amount we will pay under this Coverage will be reduced by the salvage value of that property.

(d) Extra Expense does not apply to "loss" to Covered Property as described in the BUILDING AND PERSONAL PROPERTY COVERAGE FORM.

**(3) Civil Authority**

When a Covered Cause of Loss causes damage to property other than Covered Property at a "premises", we will pay for the actual loss of "Business Income" and necessary Extra Expense you sustain caused by action of civil authority that prohibits its access to the "premises", provided that both of the following apply:

    (a) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and

    (b) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

This Civil Authority coverage for "Business Income" will begin immediately after the time of that action and will apply for a period of up to 30 days from the date of that action.

This Civil Authority coverage for Extra Expense will begin immediately after the time of that action and will end:

    1) 30 consecutive days after the time of that action; or

    2) When your "Business Income" coverage ends; whichever is later.

Doc. 1-1 at 40-41. The Policy provides separate Business Income, Extra Expense, and Civil

Authority coverage provisions. See Doc. 1-1 at 93-94.

On September 14, 2020, Defendant notified Plaintiffs by letter that their losses were not covered under the Policy, explaining that:

> The Cincinnati policy provides coverage for direct physical loss or damage to Covered Property at the premises. This direct physical loss or direct physical damage must be to property at the covered premises. Cincinnati's investigation has found no evidence of direct physical loss or damage at your premises. Similarly, there is no evidence of damage to property at other locations, precluding coverage for orders of civil authority.

Doc. 1-2 at 2. On October 26, 2020, Plaintiffs filed this action seeking a declaratory judgment that the Policy provides coverage for their "covered losses caused by loss of access to the Insured Premises, including business income, extra expense, contamination, civil authority." Doc. 12 at 20. Plaintiffs also brought a Breach of Contract claim "on the basis that Defendant's denial of coverage runs afoul of the language of the policy and/or the public policy." Doc. 12 at 3, 16-18.

On January 22, 2021, Plaintiffs filed an Amended Complaint. Doc. 12. On February 5, 2021, Cincinnati filed its Motion to Dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). Doc. 15.

## II. DISCUSSION

### A. Standard of Review

In reviewing a Rule 12(b)(6) motion, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). The plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 563. A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S.

662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In Iqbal, the Supreme Court articulated a two-step process for determining whether a complaint meets this plausibility standard. First, the court identifies allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555) (allegation that government officials adopted challenged policy "because of" its adverse effects on protected group was conclusory and not assumed to be true). Although the pleading requirements stated in "Rule 8 [of the Federal Rules of Civil Procedure] mark [] a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678-79.

Second, to the extent there are well-pleaded factual allegations, the court should assume their truth and then determine whether they plausibly give rise to an entitlement to relief. Id. at 679. "Determining whether a complaint contains sufficient facts to state a plausible claim for relief "will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief,'" and therefore should be dismissed. Id. (quoting Fed. R. Civ. P. 8(a)(2)).

The sufficiency of the factual allegations aside, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." Sons of Confederate Veterans v. City

of Lexington, 722 F.3d 224, 228 (4th Cir. 2013) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)). Indeed, where "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations, a claim must be dismissed." Neitzke v. Williams, 490 U.S. at 328; see also Stratton v. Mecklenburg Cnty. Dept. of Soc. Servs., 521 Fed. Appx. 278, 293 (4th Cir. 2013)). The court must not "accept as true a legal conclusion couched as a factual allegation." Anand v. Ocwen Loan Servicing, LLC, 754 F.3d 195, 198 (4th Cir. 2014).

### B. Insurance Coverage Under the Policy

Plaintiffs contend coverage under the Policy exists "as a direct result of the COVID-19 pandemic" and the executive orders issued by the Governors of North and South Carolina that limited access to restaurants and closed in-person dining. Doc. 12 at 16. Specifically, Plaintiffs allege that they "have incurred, and continue to incur [] direct physical loss of or damage to property, a substantial loss of business income and additional expenses covered under the Policy." Id.

### a. North Carolina Law

The parties agree that the Court applies North Carolina law to interpret the language in the Policy. See Fortune Ins. Co. v. Owens, 526 S.E.2d 463, 465 (N.C. 2000) ("the substantive law of the state where the last act to make a binding contract occurred, usually delivery of the policy, controls the interpretation of the contract"); Stahle v. CTS Corp., 817 F.3d 96, 99-100 (4th Cir. 2016); Twin City Fire Ins. Co. v. Ben Arnold–Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). Under North Carolina law, "[t]he party seeking coverage under an insurance policy bears the burden "to allege and prove coverage." N. Carolina Farm Bureau Mut. Ins. Co. v. Martin by & through Martin, 851 S.E.2d 891, 895 (N.C. 2020). The plain language of the insurance policy governs its interpretation. Id. "Where no definition for a term is contained in

the policy, unambiguous terms will be given the meaning afforded them in ordinary speech unless the context indicates that another meaning was intended." <u>Guyther v. Nationwide Mut. Fire Ins. Co.</u>, 428 S.E.2d 238, 241 (N.C. Ct. App. 1993).

Ambiguities in the terms of the policy are construed against the insurer. <u>See</u> <u>Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.</u>, 692 S.E.2d 605, 612 (N.C. 2010). The provision must be "fairly and reasonably susceptible to multiple constructions" to be ambiguous. <u>N. Carolina Farm Bureau Mut. Ins. Co.</u>, 851 S.E.2d at 895 (internal quotations and citation omitted). An ambiguity does not exist simply because "plaintiff makes a claim based upon a construction of [the policy] language which the company asserts is not its meaning." <u>Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.</u>, 172 S.E.2d 518, 522 (N.C. 1970). Lastly, the insured bears the burden of showing that its claim fits within the policy. <u>See</u> <u>Hobson Const. Co. v. Great Am. Ins. Co.</u>, 322 S.E.2d 632, 635 (N.C. Ct. App. 1984).

### b. Business Income and Extra Expense Coverage Provisions

Under Section A of the Building and Personal Property Coverage Form, coverage exists for "direct 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss." Doc. 1-1 at 25. Covered Property includes buildings, structures, signs, and business personal property. <u>Id.</u> There is no dispute that Plaintiffs' properties are covered locations. Plaintiffs base their claims on the Business Income, Extra Expense, and Civil Authority coverage provisions of the Policy.

For Business Income coverage to exist, the suspension of business operations "must be caused by direct loss to property at a premises caused by or resulting from any Covered Cause of Loss." Doc. 1-1 at 40, 93 (internal quotation marks omitted). "Loss" is defined as "accidental physical loss or accidental physical damage." Doc 1-1 at 60. Likewise, for Extra Expense

coverage to exist, there must be "direct loss to property caused by or resulting from a Covered Cause of Loss." Doc 1-1 at 41, 93.

Plaintiffs contend there is ambiguity in the Policy terms, such that the Court should construe the phrase "direct physical loss or damage" as providing for coverage caused by (1) direct physical loss or (2) direct damage. Doc. 17-2 at 7. Plaintiffs assert that because the policy provision separates "physical loss" from "physical damage" by the word "or," they must have entirely different meanings. Doc. 16 at 19. But the Court disagrees. The plain language of the Policy requires direct physical loss or damage to Plaintiffs' properties in order for coverage to apply under either the Business Income or Extra Expense provisions. These provisions are not ambiguous.

The majority of courts interpreting similar policy language have found that "direct physical loss" contemplates actual physical damage or loss to property. See, e.g., Summit Hospitality Group, LTD v. Cincinnati Ins. Co., No. 5:20-CV-254-BO, 2021 WL 831013, at *3 (E.D.N.C. Mar. 4, 2021) (finding that policy required direct physical loss or damage be incurred to trigger coverage under the Income Endorsement[3] provision); Gilreath Family & Cosmetic Dentistry, Inc. v. Cincinnati Ins. Co., No. 1:20-cv-02248-JPB, 2021 WL 778728, at *5 (N.D. Ga. March 1, 2021) (applying Georgia law to interpret Cincinnati Policy, which included Business Income, Civil Authority, and Extra Expense provisions with same language at issue here, to hold that "direct physical loss" requires "actual, physical damage to the covered premises" such that dentist office's suspension of non-emergency procedures did not constitute actual, physical

---

[3] The Income Endorsement provision provides: "We provide the coverages shown below in Paragraphs b. through e. during the "restoration period" when your "business" is necessarily totally or partially interrupted. This "interruption" must be caused by direct physical loss or damage from a covered peril to a building or business personal property at "covered locations" or in the open (or in vehicles) within 1,000 feet thereof." Summit, 2021 WL 831013, at *3.

damage for coverage to exist); Mama Jo's Inc. v. Sparta Ins. Co., 823 F. App'x 868, 879 (11th Cir. 2020) (finding that the words "direct" and "physical" modify "loss" and "impose the requirement that the damage be actual," such that summary judgment in favor of insurer was proper because the insured could not demonstrate actual physical loss[4]); Town Kitchen, LLC v. Certain Underwriters at Lloyd's, et. al., No. 20-22832-CIV, 2021 WL 768273, at *4-7 (S.D. Fla. Feb. 26, 2021) (applying Florida law to interpret similar "direct physical loss or damage to" language) ("The harm from COVID-19 stems from having living, breathing human beings inside one's business—it is not damage done to the physical business itself, it is damage done to other living, breathing human beings. To the extent it is a physical harm, such as COVID-19 particles present on surfaces in the restaurant, those can be easily cleaned.").

In summary, although the Policy does not define "direct physical loss" or "physical damage," the Court finds that the plain and ordinary meaning requires actual, physical damage to the covered premises. There is no ambiguity in the policy language here. Therefore, the Court concludes its analysis at this step. See N. Carolina Farm Bureau Mut. Ins. Co., 851 S.E.2d at 895-96 ("If the language is not 'fairly and reasonably susceptible' to multiple constructions, then we 'must enforce the contract as the parties have made it and may not, under the guise of interpreting an ambiguous provision, remake the contract and impose liability upon the company which it did not assume and for which the policyholder did not pay.'") (quoting Harleysville Mut. Ins. Co., 692 S.E.2d at 612)).

Plaintiffs' reliance on Studio 417, Inc. v. Cincinnati Ins. Co., 478 F. Supp. 3d 794, 796 (W.D. Mo. 2020) and Henderson Rd. Rest. Sys., Inc. v. Zurich Am. Ins. Co., No. 1:20 CV 1239, 2021 WL 168422, at *13 (N.D. Ohio Jan. 19, 2021) is misplaced. Those cases do not apply

---

[4] The Court acknowledges that Mama Jo's Inc. involved Florida law. However, the Eleventh Circuit's definition did not depend on an interpretation of Florida law. Therefore, the case is instructive here.

North Carolina law. Further, this Court disagrees with the expansive definition of "direct physical loss" in N. State Deli, LLC v. Cincinnati Ins. Co., which includes the "inability to possess something in the real, material or bodily world, resulting from a given cause without the intervention of other conditions." No. 20-CVS-02569, 2020 WL 6281507, at *3 (N.C. Super. Oct. 9, 2020).

Rather, the Court looks to Summit Hospitality Group, LTD v. Cincinnati Ins. Co., a recent case from the Eastern District of North Carolina, for guidance on how to apply North Carolina law to COVID-19 insurance coverage cases. No. 5:20-CV-254-BO, 2021 WL 831013 (E.D.N.C. Mar. 4, 2021). In Summit, a hotel and restaurant management firm sought a declaration that Cincinnati's policy provided business interruption coverage because executive orders issued in response to the COVID-19 pandemic interrupted access to their business locations as a "result of loss or damage to the property at non-plaintiff locations by COVID-19." 2021 WL 831013, at *1-2 (internal quotations omitted). In determining whether business interruption coverage existed, the court applied Harry's Cadillac-Pontiac-GMC Truck Co. v. Motors Ins. Corp., 486 S.E.2d 249 (N.C. Ct. App. 1997).

In Harry's Cadillac, the North Carolina Court of Appeals interpreted a business interruption coverage provision, which required that loss of income be caused by a direct physical loss. 486 S.E.2d at 251. Plaintiff auto dealership claimed it lost profits because customers could not access its property due to a snowstorm. Id. at 250. The court held there could be no business interruption coverage where the loss of income was caused by a snowstorm that only prevented access to the dealership – but did not cause any physical loss or damage to the property. Id. at 250-52 ("Plaintiff neither alleged nor offered proof that its lost business income was due to damage to or the destruction of the property, rather all the evidence shows

that the loss was proximately caused by plaintiff's inability to access the dealership due to the snowstorm . . . the loss incurred by plaintiff as a result of the inaccessibility of its dealership due to the snowstorm cannot be considered a covered cause of loss.").

As in <u>Summit</u> and <u>Harry's Cadillac</u>, "the same result is dictated here by the plain and unambiguous terms of the policy." <u>Summit</u>, 2021 WL 831013, at *4. This Court, in applying the definition of "direct physical loss" to the facts here, finds that the Amended Complaint fails to allege facts showing the direct physical damage or loss which is required for coverage under the Policy. And as in <u>Harry's Cadillac</u>, Plaintiffs' claimed business interruption was caused by a reduction in business from customers and not actual physical damage to the covered premises. Plaintiffs seek to recoup business losses incurred due to the diminished operational capacity mandated by the executive orders. But diminished capacity does not equate to actual physical damage or loss. <u>See</u> <u>Skillets, LLC v. Colony Ins. Co.</u>, No. 3:20CV678-HEH, 2021 WL 926211, at *5 (E.D. Va. Mar. 10, 2021).

Even accepting the factual allegations as true and viewed in the light most favorable to Plaintiffs, the allegations fall far short of alleging actual, physical damage to their premises. There are no factual allegations that show COVID-19 was present at Plaintiffs' premises; that the covered properties were contaminated; or that Plaintiffs sustained any direct physical loss or damage. Likewise, public health officials never revoked the authorization for employees to be present and prepare food for take-out or to have customers enter to pick up food. Plaintiffs' allegation that the "risk of COVID-19 entering the Covered Property and contaminating the surfaces is direct physical loss of and damage to the Covered Property" has been rejected by other federal courts. <u>See</u> <u>Kessler Dental Assocs., P.C. v. Dentists Ins. Co.</u>, No. 2:20-cv-03376-JDW, 2020 WL 7181057, at *4 (E.D. Pa. Dec. 7, 2020); <u>K D Unlimited Inc. v. Owners Ins. Co.</u>,

No. 1:20-CV-2163-TWT, 2021 WL 81660, at *5 (N.D. Ga. Jan. 5, 2021); Uncork & Create LLC v. Cincinnati Ins. Co., No. 2:20-CV-00401, 2020 WL 6436948 at *5 (S.D.W. Va. Nov. 2, 2020) ("There is a similar risk of exposure to the virus in any public setting, regardless of artful pleading as to the likelihood of the presence of the virus.").

This Court joins the majority of courts finding that COVID-19 and related executive orders which reduce or suspend business operations to slow the spread of the virus do not cause physical damage or loss to insured property. See e.g., Summit, 2021 WL 831013, at *4; Uncork & Create LLC, 2020 WL 6436948, at *4; Skillets, LLC, 2021 WL 926211, at *6; TJBC, Inc. v. Cincinnati Ins. Co., No. 20-cv-815-DWD, 2021 WL 243583, at *5 (S.D. Ill. Jan. 25, 2021) (dismissing complaint "because Covid-19 does not cause tangible loss or damage to the physical dimension of Plaintiff's property, and Plaintiff has not alleged that Covid-19 physically altered the appearance, or some material dimension of its property[.]"); Unmasked Mgmt., Inc. v. Century-Nat'l Ins. Co., No. 3:20-cv-01129-H-MDD, 2021 WL 242979, at *6 (S.D. Cal. Jan. 22, 2021) ("The Court agrees with Defendant that allegations showing the alleged presence of COVID-19 in or on the covered property are not sufficient to trigger coverage when direct physical loss of or damage to property is required.").

The Court is sympathetic to the difficult and unprecedented circumstances facing Plaintiffs and similar businesses. But at face value, COVID-19 harms people and not property. "The novel coronavirus has no effect on the physical premises of a business. Non-essential businesses were ordered to shut down to prevent people from exposing one another." Uncork & Create LLC, 2020 WL 6436948, at *4. Plaintiffs here have failed to allege physical loss or damage caused by COVID-19. For these reasons, the undersigned respectfully recommends that

Defendant's Motion to Dismiss with respect to coverage under the Business Income and Extra Expense provisions be granted.

c.       **Civil Authority Coverage Provision**

Plaintiffs contend that the executive orders "prohibited access to the Covered Properties" and "COVID-19 caused direct physical loss of or damage to property in the area immediately surrounding and within one (1) mile of the Covered Premises." Doc. 12 at 14. But for coverage to exist under the Civil Authority provision, there must be: (1) a government order prohibiting (not limiting) access to the insured premises and (2) the government order must be in response to direct physical damage to property other than the insured premises. Doc. 1-1 at 41, 94. Therefore, this provision requires, at minimum, that access be denied at covered locations. Id.

Here, "[a]lthough the executive orders identified in the complaint may have restricted access to plaintiff's business locations, for example by preventing or restricting in-person dining, restricted access is not the same as denied access." See Summit, 2021 WL 831013, at *4. See also Skillets, LLC, 2021 WL 926211, at *7 ("The closure orders restricted the services Skillets could provide to customers, but "[m]erely restricting access ... does not trigger coverage under [a] Civil Authority provision."). Governor Cooper's Stay at Home Order encouraged the public to stay home but did not prohibit access to Plaintiffs' premises. Doc. 1-5. Rather, the Orders permitted anyone to access the premises for carry-out, drive-through, and delivery. Doc. 12 at 12. Moreover, Governor Cooper and Governor McMaster issued their Orders to reduce the spread of COVID-19 and limit people from gathering, and not because of any direct physical loss or damage to any property. See Uncork & Create LLC, 2020 WL 6436948, at *5 ("COVID-19 poses a serious risk to people gathered in proximity to one another, and the governmental orders closing certain businesses were designed to ameliorate that risk."); Henry's Louisiana Grill, Inc.

v. Allied Ins. Co. of Am., No. 1:20-CV-2939, 2020 WL 5938755, at *5 (N.D. Ga. Oct. 6, 2020) (holding that an Executive Order that prompted closure of restaurant dining room "merely recognized an existing threat" and "did not represent an external event that changed the insured property")).

Plaintiffs fail to allege that civil authority orders denied access to their premises. Therefore, Plaintiffs have failed to state a claim that the interruption by Civil Authority provision provides coverage. The undersigned respectfully recommends that Defendant's Motion to Dismiss with respect to coverage under the Civil Authority provision be granted.

Since Plaintiffs cannot show that they are entitled to a declaration of coverage, the undersigned respectfully recommends that their remaining breach of contract claim be dismissed.

## III. ORDER

**IT IS ORDERED** that all further proceedings in this action, including all discovery, are **STAYED** pending the District Judge's ruling on this Memorandum and Recommendation and Order.

## IV. RECOMMENDATION

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that "Defendant The Cincinnati Insurance Company's Rule 12(b)(6) Motion to Dismiss Plaintiffs' Amended Complaint," Doc. 15, be **GRANTED**.

## V. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within fourteen days after service of same. Failure to file objections to this Memorandum with the District Court constitutes a waiver of the right to

de novo review by the District Judge.  <u>Diamond v. Colonial Life</u>, 416 F.3d 310, 315-16 (4th Cir. 2005); <u>Wells v. Shriners Hosp.</u>, 109 F.3d 198, 201 (4th Cir. 1997); <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1365 (4th Cir. 1989).   Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal.  <u>Thomas v. Arn</u>, 474 U.S. 140, 147 (1985); <u>Diamond</u>, 416 F.3d at 316; <u>Page v. Lee</u>, 337 F.3d 411, 416 n.3 (4th Cir. 2003); <u>Wells</u>, 109 F.3d at 201; <u>Wright v. Collins</u>, 766 F.2d 841, 845-46 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to the parties' counsel <u>and to the Honorable Robert J. Conrad, Jr.</u>

**SO ORDERED AND RECOMMENDED.**

Signed: March 18, 2021

David S. Cayer
United States Magistrate Judge